May it please the court, I'm Sandra Gillies on behalf of petitioner Jessica Holmes. I'd like to reserve two minutes for rebuttal please. If you could speak into the microphone that would help me. Sorry. Not at all, it's just a big equilibrium. It is, it is, but I'm more of a paper lawyer so public speaking. This court told the district court in its prior order to determine whether or Jessie Ortiz, petitioner's trial counsel, told her that LWOP was the mandatory sentence if she was convicted of the murder and the robberies below. Magistrate found, after it went back for evidentiary hearing, found that Ortiz didn't use the word mandatory but said the petitioner understood from what Ortiz said that she would be convicted of the special circumstances and that the only sentence she could find was LWOP. So the magistrate, even in his own order, didn't question his interpretation of what this court had told him to do in this one narrow region. But then he failed to sort of step back and see what else this court had allowed him to do in the hearing. And because he did not take that step back, he did not fully consider the issues. What questions would you have liked to have asked that you didn't get to ask? I was not petitioner's counsel in the hearing. I think the questions I would have asked would have focused exactly on the interaction between Ortiz and Ms. Holmes, who was 18. She's, you know, at this point when she's arrested, she's a recovering drug addict. You know, the Supreme Court has told us that juveniles, and she's unfortunately right over the edge, you know, their thinking isn't totally formed. So what questions should counsel have asked and sort of forced the magistrate to say, no, you can't ask that question? What questions would you have liked to have asked that didn't get asked in this hearing? Because you've got a little bit of an uphill swim here because you're back on a remand after having lost us twice now on credibility findings against your client in favor of her lawyer. True. So what questions, what was left out of this hearing that needed to have been asked? Well, a couple of things were left out. First of all, about Ortiz's history, which the magistrate did not allow counsel. He allowed counsel to make the offer of proof about Ortiz's problems with the State Bar, who he had abandoned. But all of this was to be issued as pattern or practice of incompetence and lying, right? Right. No, wait, hold it. The district court didn't understand it that way. You're talking about the magistrate judge and the findings, right, the R&R. But the district court, forgive me for interrupting, but the district court said, according to Holmes, counsel's, quote, failure to carry out his responsibilities in other cases and his lies to other courts and other clients bolster the conclusion that he failed to act professionally and competently. So I agree, I think Judge Bybee's point is well taken, that there are many, many references to competence. But there's another question about his prior conduct which really goes to veracity. Sure. And the time is ticking. So it seems to me that going into this hearing, given the focus of the remand is what did you tell her, did she understand this is going to be mandatory LWOP? Right. The credibility is baked right in there. And the district court certainly, and Judge Singleton, a very experienced district court judge, understood that was part of the idea, and I don't mean to be flip, but that was part of the scope. Certainly, certainly. Okay. And so the magistrate judge relied on 401 about the evidence indicating that this lawyer had been dishonest in this case to this client, to her family, telling her that another lawyer was going to be hired, for example. And the magistrate judge said that was excluded under 401, it was irrelevant. That's not what the district court relied on. He relied on 401 and 403.  Given the time is ticking, could you focus on the 403 ruling that went to the exclusion of the evidence going to dishonesty, not to incompetence? Right. So the district court is looking at consumption of time and many trials and the kind of what it saw as turning the focus away from what Ortiz said in this particular case. He didn't talk about time. The district court said this prior events of dishonesty would have unduly complicated the issues. Right. Right. And complication can include time. But it can't complicate the issue if credibility is central. And I do have an uphill battle. The magistrate has made credibility findings, which the district court upheld. But I'm not talking about on appeal. I'm talking about in the hearing, going back to Judge Bybee's point, what did they The district court understood that the credibility was part of it within the scope of the remand and was part of the issue. But he affirmed the, or I should say adopted, the order excluding this evidence of, I'll say that it went to veracity, on the basis of 403, not 401. But if it's, if veracity and credibility are central. Yes. Then evidence that goes to Ortiz's credibility, when that is central, you know, who, what did Ortiz say and when did he say it and how did he say it? So could you go back, this goes back to, I think, to Judge Bybee's question. What did, what got left out? What didn't get asked? Could you be specific about what evidence about veracity or credibility didn't get raised? Well, the magistrate and the district court upheld the, they allowed Mr. Bigelow to make an offer of proof as to, particularly about these state bar things, but they didn't explore them with Mr. Ortiz. The other thing that I think counsel could have asked, but was frustrated, this was a contentious hearing between habeas counsel in the district court and the magistrate judge, I think would be exactly how, try to pin down Ortiz about what he said, not only about the mandatory nature, but about how the trial was going to shake out if she rejected and went to trial. And because she can't really understand the advantages of the plea unless she understands the almost certain possibility that she's going to be convicted. And I think that is what Mr. Bigelow wasn't able to explore in any depth because the magistrate was focused on mandatory, even though in his FNRs and also in the district court's order, they sort of stepped back from mandatory. And, you know. Are there questions, were there other witnesses that should have been questioned here, or is it just different questions that should have been put to Holmes, or different questions that should have been put to Ortiz? Counsel was prepared to call the lawyer from the Cochran Law Firm to talk about Ortiz's misleading of the superior court in San Joaquin County. That's Rose. Yes, Rose. But he was fired for filing something that was allegedly in a way dishonest. Right, right. And Bigelow had said he was going to call Rose. He was also going to call Pete Harnett, who was the second lawyer who was, Ortiz had said he was going to hire, he told the grandma he was going to hire a second lawyer. And Shannon Gibson, the secretary who was going to explain that he told her to say that he had hired Harnett. Yes, exactly. But none of that happened. Yes, exactly. Were those witnesses there at the hearing and ready to testify? I do not believe they were there. How do we put all of this? I will make sure that you get your rebuttal time, so don't worry about that. So how do we put all that together? Because if this had been submitted before a jury and these colloquies were being held outside of the jury's earshot, that would be one thing, because then the jury would not know that there were going to be these sidebar arguments. But here you've got a magistrate who's going to be the finder of fact, who is completely aware of what the bar did. He's very aware of what these witnesses will testify to and what the incidents were and who may or may not be waiting out in the hall, but may be called at a subsequent hearing. So, you know, the magistrate sort of knows all of this stuff anyway. So how do we process all of that? Whenever there's a court trial and prejudicial evidence is introduced and, you know, maybe some of it should have been kept out or whatever, the courts say the court knows how to compartmentalize. And so even though the magistrate was aware of all the, you know, whether or not the witnesses were physically out in the hall and was aware of the sidebar history of Ortiz's, he compartmentalized. He doesn't refer to it in the findings and recommendations. The district court says it's proper to exclude. And so I think that the fact that there is an awareness of it doesn't mean that it was properly before the court and the court properly considered it. Could I ask one follow-up question? Of course. Thank you. Judge Bybee baked into his question the premise that the magistrate judge was aware of these pieces of evidence, these witnesses. And my question is whether or not you agree with that. I looked in the record to figure out what was really said on record to the magistrate judge about what these witnesses would have testified to versus what we now know on appeal. And I'm interested in whether you agree that that was really fleshed out at the hearing. At the end of the, I mean, at the very beginning of the hearing, Mr. Bigelow says, I have all this information. Magistrate Judge Newman says, okay, you can make an offer of proof. So at the end of the hearing, Bigelow makes this, like, ten-point offer. He also had attempted to expand the record earlier on in front of us. I've read that hearing. Right. And so that information about the proceedings in San Joaquin County where he allegedly lied or misled the State Bar proceedings, definitely the harned declaration saying, yes, I'd been contacted, but that was the last I heard of it, the whole incident with the hiring the second lawyer and what was told to the grandma. So. And all those things what? He did know? The magistrate judge did know those things? He did know, because Mr. Bigelow had attempted, A, to expand the record to include that, and when that was denied, he then made the offer of proof at the end of the hearing with a ten bullet point, 10 or 12. Okay. So the answer to my question is that the premise of Judge Bybee's question is correct. You think the magistrate judge did know these things? Yeah. I think he knew them. Okay. But I don't think he took them into account. Okay. Thank you, and thank you for hearing. Okay. Thank you.  You will get time for rebuttal. Thank you. Let's hear from the State. Ms. Mitchell. May it please the Court, Stephanie Mitchell for Respondent. I will start with the discussion about the exclusion of the evidence. And in this case, I just want to point out that the offer of proof wasn't to go to his credibility. It wasn't truthfulness. He wasn't trying to admit this evidence. He repeatedly said that he wanted this evidence in to rebut the presumption that Mr. Ortiz did the quote, unquote, smart thing. He did do that. He said that repeatedly, and then there's one place where he says it goes to veracity, that he wanted to do it, introduce it for veracity, which is why I think it's important that the district court judge at ER-3 clearly recognizes that that was part of the argument. The problem with that, though, is that specific instances of extrinsic evidence and specific instances of conduct cannot be used to attack the credibility. And in this case, I'm looking at evidence code 608, I believe. Right. Did 608 ever get argued? It did not. Mr. Bigelow never brought it up because in this circumstance, as I was going through the evidence code sections, it seemed to me that the way that it would proceed is that first there would have to be a character witness that, you know, like the respondent would have to have called a witness to testify about Mr. Ortiz's reputation for truthfulness or opinion about his truthfulness. And then at that point, Mr. Bigelow could have then questioned that character witness about these specific instances of conduct. But in 608 also, I think that it talks about cross-examination. So under 608B, I don't see how Mr. Bigelow gets that in with his own witness. So I don't think that there's — It's difficult, isn't it? I've had this thought experiment, too, to try to figure out how is this supposed to play out when the issue really on remand was what did you tell her, what did she understand about whether this was mandatory. And there's this — I think counsel is right. There's quite a list of evidence they wanted to introduce, not just about other cases, but representations that they claim were misrepresentations in this case. And your position is that was properly excluded and 608 would have prevented it from coming in. Is that right? Yes. Yes. And I think that in this case, too, I know that, you know, of course, credibility and truthfulness is always relevant, always. But in this case, the judge also found that Ms. Holmes was not credible. And evidence about Mr. Ortiz's truthfulness really doesn't have anything to do with his separate finding that she was not credible. Did Mr. Ortiz have a file for this case? There's a place where it says he didn't have notes. Was that just notes about the advice on the plea, or what is that? There was a case file. Mr. Bigelow was concerned that he was not getting the entire case file because based on his review, he thought that there should be things in there that were not. But the entire case file, what there was, was turned over. And there's not notes about the evidence? No. No. There was no testimony or nothing that said that he had documented what he had told her. Okay. Can I ask you just a personal question? Oh, yeah. If we were to affirm here, is that a result you're comfortable with? You think justice will have prevailed if she spends the rest of her life in prison? It's a difficult question. And one. You're here defending that. And I understand that. I understand from the last time I was here that the court is concerned about this because she committed a crime when she was 18. She's 19 years old. She rejects a plea that would have given her the possibility of parole. And now she's in there for the rest of her life. In contrast to the guy who pulled the trigger. Right. She's a getaway driver. It's a pretty sympathetic case. It's a troubling case. So what's your best shot? I mean, she is sympathetic. But I think we also have to keep in mind this isn't one of those circumstances where she just dragged into one robbery and one shooting and had no idea. This was a pattern that she did. It's true of all three of them, right? All three involved in this series. It's a very serious series of robberies, to be sure. Yes. But going back to Judge Watford's question. Like I said, it's difficult. I think that she made many mistakes. And, you know, it's really ñ and I know this is dodging. It's really not up to me to decide what the appropriate punishment is. Is there any other ñ does she have any other remedy in California? Well, I was talking to opposing counsel about that and wondering if she had made a request to commute her sentence to the governor. It largely rests with the governor's discretion at this point. It would rest with the governor's discretion at that point. Could I ask a question about ñ there are these two offers, I think, 18 to life and then 16 to life, if I'm understanding. Yes. And the briefing says shortly before trial, this offer was then, okay, 16 to life. I'm not sure what shortly before trial means. But more to the point, what I can't tell is whether she would have understood then that she would have a defense ñ have had a defense in the form of this expert that was supposed to testify, and then her lawyer later decided not to call the expert, of course. But at the time she turned down the 16 to life, did she think she was going to have a ñ excuse me, think she was going to have a defense? Well, at the time that she turned down the offer, Mr. Ortiz had spoke to her about his proposed defense. And his proposed defense was not just Dr. Bernard. His defense was also relying on her interview. I know, but her interview is devastating, counsel. It's devastating. But in there she also denies that she had any prior knowledge that the ñ that these robberies were going to occur. And then she gets a subsequent statement in which she said, I did it. Her interviews are devastating, right? Yes. I mean, there's no doubt about that. That was the evidence against her, was her statement. Right, right. Because she was not identified. Right, until the video from the store where she was buying the ammunition, and then she admitted to doing that as well. Yes. So my question really is, you know, that didn't change, right? That was a constant. But at the time she turned down the last offer of 16 to life, at that juncture, would she still have expected she had anticipated that the expert would have been called on her behalf to explain about the ñ The testimony was that, yes, at that point it was the belief that Dr. Bernard would testify. And then that went away later. And then that went away later in the trial when they discussed that it would open the door to her drug use. One final question, Elise, from me. The ñ there was this evidence ñ not evidence, but there's certainly a flavor in the record that she was influenced or may have been influenced by her family members. But there's also an indication she didn't talk directly to her family members, that Mr. Ortiz was triangulating between the two of them. Is that right? Well, there's some conflicting evidence on that. There is testimony that Mr. Ortiz did act as a go-between. And Ms. Holmes did at one point testify that when she talked to her grandmother on her phone, her grandmother was concerned about saying anything over the phone. But I think there also was testimony from Ms. Holmes that she did speak to her grandmother about this. I couldn't figure out one way or another whether she had other input, but ñ okay. Can I ask ñ I'm sorry, you have a more substantive point to make. No. I am here to answer your question. I don't have good questions. I mean, I just wanted to question your answer about whether ñ Judge Bybee asked whether, you know, getting some kind of a commutation from the governor is the only relief available. And I guess, is that really true? Your office ñ that's why I asked if you personally think this is the right result, because you're standing here defending that. And if ñ I think if I were in your shoes and I got a case where I thought ñ and this is how I feel, I'm just telling you. This is a real injustice. I don't think she should spend the rest of her life in prison. I think I would be ñ I'd have some ability to influence the position my office would take vis-a-vis giving her some relief. I mean, I can't remember how many years she's served so far, but, I mean, if we just ñ if you get an affirmance and we go away, she's really going to spend the rest of her life, from the time she was 18 until she dies, for what she did here? That just seems to me not very defensible. But that's why I put the earlier question to you. And I understand your concerns. I do. I do. I'm not here to say that she is unsympathetic. I agree. She is. But still, whether I have any influence on what can happen to her case, I do not. I can relay to my office the concerns. But those kind of decisions are, you know, executive decisions, not mine. And they would also involve ñ Is there anybody within the Attorney General's office who would have the power to reduce the sentence? Or does it all ñ does it have to go to the governor? I honestly don't know if I'm in a position to answer that question. I do think that it's difficult to do when you do have a valid judgment, to somehow go around the valid judgment and change a sentence that is the only sentence that it could be. I believe Mr. Bigelow had meetings with the DA's office while there was a petition in the California Supreme Court pending. I'm not privy to all of those discussions. But I know those did occur. So I actually think that it's really not our office that would do that. It would be the district attorney's office that would have that role. I know I said that that was my last question. But I'm going to ask you one more. You're going to lose your credibility. Yes, well, that may ñ yes, that might be right. The other thing that really gnaws at me, reading the transcripts, is that he seemed to advise her ñ and I fully appreciate what arguments have been raised. But he seemed to be advising her, and she recalls him advising that, you know, the statement might be difficult for her. Her statements might have been difficult, but that the jury would have to decide. Am I missing something? I read those transcripts, the statement she gave, the interview. I thought there was almost nothing left. Right. She had pretty much confessed, right? Or have I missed something? Truly, I would love to know if I'm missing something. I believe, in my memory, is that she did start off with saying that she did not know what happened. Right. And by the time she was done, what was left? I honestly am sorry. I don't remember if at the end she was admitting that, okay, I did know. Do you remember her saying, I did it, in the subsequent statement? I don't recall if she said that about all of the robberies. Okay. All right. Now I really am done. Thank you. Okay. Thank you, Ms. Mitchell. Thank you. Ms. Gillies, you have time if you wish it. Briefly, Your Honor. A couple of points. There was a trial file. Mr. Bigelow did get it. But what concerned him and is concerning is that there were no notes about the offer. Either offer? Either offer. Okay. There was an email that the DA's office had sent to Ortiz that was in his file about the first offer, the 18 to life. Conveying it? Conveying it. But Ortiz did not have much of a recollection about what he then told Ms. Holmes. I mean, there was this whole life is life early on. But there were no notes, nothing in writing that he had given to Ms. Holmes, nothing in writing that he had given to the grandma, who is obviously, you know, very much involved. She is the one who is paying the fees. And also the evidence I believe was not contradicted that it was triangulated, that the family was reluctant to say anything about the case over the phones because they are tapped, the jail phones. You know, they are listened to. And so messages to Jessica from her family came through Mr. Ortiz who could go and talk to her confidentially. So the fact that she may have relied on her family isn't determinative because her family is getting the same advice that Ortiz is or isn't giving to her. This is a troubling case. I don't want the court to decide. I will tell you that there is a, you know, there's, with some of the criminal justice reform, there's 1170.191, I want to think. It's something, one of the new about felony murder. And so there is a possibility of petitioning. But she would have to show, unfortunately, she's got the verdict of the special circumstance verdict. So whether she can get past that. This is petitioning the governor or petitioning the court? The court, the superior court. And what about the status of any requests to the governor? So far as I know, that has not been done. I think she's waiting for this. I am looking into the 1170.195. But, again, I don't believe that this court should, and I don't believe it will, back away from its determination to make a decision on this record because the chance that she's going to get any relief is iffy given that there was a special circumstance finding. We'd have to overcome that. It's for those people serving time for felony murder who were not major participants, as in Tyson, and who did not have the intent to kill. And with the special circumstance, the finding has already been made against her. What was the nature of that finding? So under Tyson v. Arizona, the person who was not the killer. Oh, no, no. I was asking, in this trial, the jury returned the special circumstance finding. What was that? It was that she acted. I didn't bring the jury instructions with me, but it's that she acted. They were instructed under the law at the time about being a major participant and being recklessly indifferent. Oh, I see. And if the court would like, I can send that. No, no, no. But you're saying the jury. I thought the finding was just simply that a murder occurred during the course of a robbery, that she was just the getaway, but it was a more specific focus on her culpability? It was a more specific finding. So, I mean, there is an avenue, but it's not certainly a ñ it's like being here. It's an uphill battle to get there. So, anyway, I've intruded on your time. Thank you, Ms. Gillespie. Thank you. We thank both counsel for your candor with the court today and your forthrightness. We thank you. And with that, the court stands adjourned. All rise.
judges: Bybee, Christen, Watford